## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEFFREY MONNIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE HARTFORD FINANCIAL | ) | 8:08CV491 |
| SERVICES GROUP, INC.,  HARTFORD | ) | |
| LIFE AND ACCIDENT INSURANCE | ) | |
| COMPANY, HARTFORD LIFE | ) | MEMORANDUM |
| INSURANCE COMPANY, | ) | AND ORDER |
| CONTINENTAL CASUALTY | ) | |
| COMPANY, CONTINENTAL | ) | |
| ASSURANCE COMPANY, and | ) | |
| HARMON INDUSTRIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the magistrate judge pursuant to 28 U.S.C. § 636 and the consent of the parties on cross-motions for summary judgment (Filings 38 & 39).  For the reasons discussed below, the court finds that summary judgment should be granted in favor of the plaintiff and against the defendants.  Plaintiff is given until March 15, 2010 to file a Motion for Attorney Fees pursuant to 29 U.S.C. § 1132(g).

## I.  BACKGROUND

Plaintiff, Jeffrey Monnier, brought this action in state court for breach of a disability insurance policy.  The policy of insurance was issued and made available to the plaintiff as part of his employment consideration by his former employer, Harmon Industries, Inc.

Plaintiff began receiving disability insurance benefit payments effective September 1999. Defendants stopped making payments on February 13, 2008. Plaintiff's appeal was denied in September 2008, and plaintiff filed this case on October 8, 2008.

Defendants, Continental Casualty Company and Hartford Life & Accident Insurance Company (together, "Hartford")[1] removed the case to federal court. Since the policy in question funds certain benefits payable under an Employee Welfare Benefit Plan as defined by 29 U.S.C. § 1002(1), the plaintiff's claim is for recovery of benefits under the Plan. This court has subject matter jurisdiction under 28 U.S.C. § 1331 and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(e)(1) ("ERISA").

## II.  STANDARD OF REVIEW

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If an ERISA plan gives its administrator or trustees discretionary authority to determine eligibility for benefits, the court reviews such a decision for an abuse of discretion.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 115; *Wakkinen v. UNUM Life Ins. Co. of America*, 531 F.3d 575, 580 (8th Cir. 2008).

---

[1]The remaining named defendants, The Hartford Financial Services Group, Inc., Hartford Life Insurance Company, Continental Assurance Company, and Harmon Industries, Inc. were not served with process.

In this instance, Hartford agrees that the Plan does not grant discretionary authority to it or the predecessor insurer.  (Defendants' Brief, Filing 40 at p. 10/18).  Thus, Hartford's termination of benefits must be reviewed under a *de novo* standard.

### III.  FINDINGS OF FACT

The court has conducted a *de novo* review of the administrative record (Filings 21-32) and finds that the following facts are uncontroverted for purposes of the parties' motions for summary judgment and constitute the material facts upon which a resolution of the issues must be premised.

1.    Plaintiff, a former employee of Harmon Industries, is an "Insured Employee" under a disability insurance policy ("Policy") issued by Continental Casualty Company and subsequently assumed by Hartford Life and Accident Insurance Company.

2.    Pursuant to the Policy, Continental, as assumed by Hartford, agreed to pay a monthly benefit for each month of an Insured Employee's "Total Disability."  *See* Filing 23, p. 46/112, M00270.  The Policy provides, in relevant part:

"Total Disability" means that, during the Elimination Period [180 days] and the Insured Employee Occupation Period [24 months][2] ... the Insured Employee, because of Injury or Sickness, is:

(1)   ***continuously unable to perform the substantial and material duties of his regular occupation***;

---

[2]The "Elimination Period" was 180 days  and the "Insured Employee Occupation Period "was either 36 months or 24 months, depending on whether the employee was categorized as a Class I or a Class II employee.  Filing 23 at pp. 35-37/112, M00259-261.  Apparently, plaintiff was a "Class II" employee, as the administrative record reflects that his disability status changed as of September 15, 2001 under the terms of the Policy.  *See* Filing 27 at p. 2/85, M00668.

-3-

(2)    under the regular care of a licensed physician other than himself; and

(3)    not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

After the Monthly Benefit has been payable for the Insured Employee Occupation Period [24 months] ..., "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:

(1)    continuously unable to perform the substantial and material duties of ***any occupation*** for which he is or becomes qualified by education, training or experience; and

(2)    under the regular care of a licensed physician other than himself.

Filing 23 at p. 45/112, M00269 (emphasis added).

3.    Plaintiff has a high school education.  He obtained a degree in manufacturing drafting and design in 1993 and worked as a Drafter for Harmon Industries for approximately five years.  Before working at Harmon Industries, plaintiff had worked for other employers as a stock clerk and sales representative.  (Filing 27 at p. 7/85, M00673; Filing 23 at pp. 83-84/112, M00301-302; Filing 30 at p. 22/85, M00943).

4.    Plaintiff attended special needs classes during high school and has difficulty with writing, reading comprehension, and spelling.  He was diagnosed with Attention Deficit Disorder.  He obtained his AA degree in manufacturing drafting and design with the help of special counselors and tutors.  *See* Filing 21 at p. 42/112, M00042; Filing 24 at p. 19/112; M00349.

5.    Plaintiff sustained a laceration of his peroneal nerve in September 1978 and continues to have a severe right foot drop and other complications from that injury.  He

-4-

sustained a gunshot wound to his left hand in 1990, and continues to suffer diminished use of two fingers. *See, e.g.*, Filing 22 at pp. 68 & 89/112, M00179 & M00201.

6.     In 1990 or 1991, plaintiff injured his thoracic spine, fracturing at least one of the vertebra. He underwent "extensive fusion of his spine" at that time. The injury could not be entirely corrected surgically due to the plaintiff's weight, which was 330 pounds as of September 15, 1999. Medical records indicate that plaintiff was "doing fairly well" by 1995; however, he was injured in a car accident in April 1997, after which he complained of additional pain. Filing 22 at p. 89/112, M00201; Filing 31 at p. 27/85, M01033.

7.     Plaintiff was born with only one kidney, and his single functioning kidney is impaired. Plaintiff's chronic renal problems prohibit him from taking many medications, many of which could help to control his symptoms. *See, e.g.*, Filing 30 at pp. 28, 34, 36, & 60/85, M00949, M00955, M00957 & M00981.

8.     Plaintiff has a history of poorly-controlled hypertension, dating back to at least 1994. He continues to have serious problems with high blood pressure. He has not always been compliant with his medical program for this condition, citing the high cost of the prescribed medications.

9.     Plaintiff stopped working in March 1999, citing ongoing low back pain. He has been receiving Social Security disability benefits since April 1999. *See* Filing 23 at p. 97/112, M00315.

-5-

10.   Plaintiff's employment with Harmon Industries was terminated effective November 11, 1999 pursuant to Harmon's policy to terminate an employee after 26 weeks' absence.  Filing 31 at p. 13/85, M01019.

11.   After a lengthy investigation, conducted in light of the plaintiff's preexisting conditions, Continental approved plaintiff's claim for long term disability benefits.  *See generally* Filing 30.  By letter dated December 2, 1999, Plaintiff was advised that the period from 3/19/99 through 9/14/99 was used to satisfy the policy's 180-day Elimination Period.  The letter further advised:

> Benefits under this policy are payable for 24 months if you are totally disabled from your own occupation.  After 24 months, benefits will continue only if you are totally disabled from any occupation for which you are or become qualified by education, training or experience up to the maximum period payable as stated in the policy.

The letter explained that the policy required the plaintiff to be under the regular care of a licensed physician and provide proof of his continuing disability.  Filing 30 at pp. 44-45/85, M00965-M00966.

12.   In October 2003, plaintiff had gastric bypass surgery which helped him reduce his weight from over 300 pounds to 190 pounds.  Filing 21 at p. 39/112, M00039; Filing 29 at p. 72/85, M00908.  He weighed 230 pounds on January 21, 2008, when he was admitted to the hospital for revaluation of occipital headaches.  Filing 24 at p. 81/112, M00411.

13.   Plaintiff received a pacemaker in 2004.  *See* Filing 22 at p. 68/112, M00180.

14.   Hartford assumed the administration of the Policy and, in 2005, hired private investigators to conduct surveillance of the plaintiff.  During the periods of surveillance, which occurred on six days during June, July and August 2005, plaintiff was seen driving his car to the gas station, talking to other people in a public park, cleaning his car windows, assisting a woman place plastic bags in her vehicle, checking his mailbox, and walking down a road at a slow pace sweating heavily.  *See* Filing 21 at pp. 22-29 & 50-73, M00004-M00029 & M00050-M00073.  The investigators also uncovered information that the plaintiff may have, at some point, procured a "saltwater fish/snook" licence in Florida.  *See* Filing 21 at p. 110/112, M00110.

15.   Plaintiff was advised of Hartford's surveillance activity when he was personally interviewed at his home on October 11, 2005 by Hartford's investigator, Cliff M'Sadoques. The interview lasted 3 hours and 45 minutes.  Filing 22 at p. 17/112.  Plaintiff admitted that he walks for exercise and goes fishing.  Filing 22 at p. 18/112.  At that time, plaintiff signed a statement acknowledging that the video of some of his activities showed the following:  "I was observed getting my mail, some days staying home all day, I was observed going to my local park ... for my walk and driving to a gas station."  Filing 21 at p. 43/112.   Hartford's records show that, as a result of this investigation, "It was determined that the claimant has continued to meet the requirements of the policy definition of disability and will continue to receive his monthly disability payments.  This case is being closed at this time and no referral will be made."

16.    Plaintiff had a radical prostatectomy for prostate cancer in February 2006.  He has remained free of any evidence of prostate cancer as of the filing of the administrative record in this case.  *See* Filing 22 at p. 68/112, M00180; Filing 28 at p. 15/85, M00766.

17.    In 2007, plaintiff had a coronary angiography and left heart catheterization after experiencing chest pain.  The doctors could not investigate for renal artery stenosis because it was not possible to use more dye due to plaintiff's hypertension and renal insufficiency.  The plaintiff had urological complications after this procedure.  *See* Filing 27 at pp. 80-85/85, M00746-M00751.

18.    Plaintiff fell on ice on January 4, 2007, landing on his back on the left side.

19.    Plaintiff was injured in a car accident on August 8, 2007, after which he complained of increased pain in his upper and lower back.  Filing 24 at pp. 27-38, M00357-M00368.  He declined pain medicine in the emergency room because he had a poorly functioning kidney.  Filing 24 at p. 33/112, M00363.

20.    Plaintiff has suffered from sleep apnea since approximately 1998.  See, e.g., Filing 31 at p. 64/85, M01070; Filing 24 at p. 18/112, M00348.

21.    Plaintiff takes Tylenol No. 3, three to four times a day, for pain control.  *See, e.g.*, Filing 24 at p. 81/112, M00411.  Numerous caudal steroid injections have not resulted in long-term pain relief.  Plaintiff is allergic to morphine.  Filing 24 at p. 81/112, M00411.

22.    Plaintiff was admitted to the hospital on January 21, 2008[3] for revaluation of occipital headaches.  Filing 24 at p. 81/112, M00411.  A greater occipital nerve block was performed.  Filing 24 at p. 84/112, M00414.  The discharge summary, Filing 24 at p. 68/112 reflects the following diagnoses:

1.    Hypertensive urgency, now better controlled with increased doses of labetalol, Catapres and nifedipine.

2.    Chronic occipital headaches now undergoing occipital nerve block.

3.    History of prostate cancer, now status post TURP.

4.    History of bradyarrhythmia status post pacemaker implant.

5.    History of solitary kidney with chronic kidney disease with baseline creatinine around 2.2 to 2.3.

6.    History of osteoarthritis.

7.    History of gastric bypass and back surgery.

8.    History of hernia repair, lithotripsy, prostatic surgery and pacemaker implant as above.

22.    By letter dated February 13, 2008, Hartford informed plaintiff that it had completed its annual review of his claim for benefits and determined that he did not meet the policy definition of "Disability" beyond January 31, 2008, and long term disability benefits would not be payable to plaintiff as of that date.  Hartford stated that its decision was based on "policy language," and a review of all the papers contained in plaintiff's file "as a whole." Filing 23 at pp. 82-87/112, M00300-M00305; Filing 27 at pp. 1-6/85, M00667-M00672 (signed version).

---

[3]The corresponding medical records, from the Holmes Regional Medical Center in Melbourne, Florida, indicate that plaintiff spent six months of each year living with his mother in Florida, and the other six months living in Nebraska.  Filing 24 at p. 81/112, M00411.

-9-

23.   The January 29, 2008 decision to terminate benefits was based, in part, on forms completed by two of plaintiff's doctors.  Hartford's Benefit Management Services Atlanta Disability Claim Office sent form letters to the doctors advising that Hartford needed information from them "so that we can correctly assess [plaintiff's] vocational potential." Selected medical information[4] was summarized in the first paragraph of the letters, and the doctors were asked whether they agreed or disagreed with the following restrictions for the plaintiff "(based on an 8 hour workday)":

> "No sitting longer than 1 to 3 hours at a time without the ability to get up and stretch or change positions.  No more than occasional standing or walking (1-2 hours total per workday).  No repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning.  No repetitive lifting, carrying, pushing or pulling greater than 10 pounds occasionally.  The patient can perform frequent to constant fingering, feeling and/or handling (bilateral upper extremities).  He is able to sit at a table or desk with his arms supported on the arms of a chair or on a table."

> * * * *

> "No standing and/or walking longer than 2 to 3 hours at a time without the ability to change positions.  The ability to perform occasional sitting (1-2 hours total per workday).  No repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning.  The ability to perform lifting, carrying, pushing or pulling up to 20 pounds occasionally and up to 10 pounds frequently.  The patient can perform frequent to constant fingering, feeling and/or handling (bilateral upper extremities)."

24.   On or about October 17, 2007, plaintiff's longtime primary care physician, Dr. Roy W. Holeyfield, Jr.[5], transmitted the document back to Hartford, placing checkmarks on

---

[4]I note that the two physicians were provided different sets of information by Hartford.

[5]Hartford's form letter was directed to "Dr. Holeyfield Jr." at a fax number.

-10-

the form indicating that he agreed with the both of the "restrictions and limitations provided."
Filing 28 at pp. 11-12/85, M00762-M00763.

25.   On or about December 5, 2007, Hartford sent a similar form letter to plaintiff's
nephrologist, Dr. Gerald Groggel.  Dr. Groggel's response indicated that he did agree with
the first restriction, but not the second restriction.

26.   Dr. Holeyfield rescinded the October 17, 2007 communication.  On March 10,
2008, he issued a "Disability Letter" stating that, based on plaintiff's chronic back pain, he
did not feel that plaintiff was able to work more than 1-2 hours a day–total, due to his chronic
pains.  Dr. Holeyfield did not understand Hartford's form letter to refer to an 8-hour workday
and noted that the quoted restrictions themselves did not mention the total duration of work
throughout the day.  His March 10, 2008 letter notes that plaintiff's blood pressure was very
uncontrolled, and he and plaintiff's nephrologist were having difficulty getting his blood
pressure controlled.  Plaintiff's kidney function was also poor, and his uncontrolled blood
pressure would continue to worsen his kidney function.  Plaintiff was at significant increased
risk of a stroke, and exertional activities would raise his blood pressure and further increase
his risk of renal damage.  Filing 24 at p. 25/112, M00355.

27.   On April 23, 2008, plaintiff was admitted to the emergency room after he
suddenly became confused and disoriented while playing golf.

28.   Plaintiff injured himself on May 31, 2008 when he hit his left hand with a
hammer while taking down a shed and trying to remove nails.  Filing 24 at p. 64-65/112,

M00394-395; Filing 22 at p. 73/112, M00185.  Emergency room records indicate that his

blood pressure was high and he had a previous history of mini strokes, but he had not taken

his medications that morning.  Filing 24 at p. 65/112, M00395.

29.   Plaintiff appealed Hartford's denial of benefits.  He obtained an independent

medical evaluation from an occupational health specialist, D.M. Gammel, MD FAADEP,

CIME, who examined plaintiff on July 22, 2008.  Based on his examination, and his review

of the plaintiff's medical records covering December 10, 1990 through May 31, 2008, Dr.

Gammel opined:

> It is my opinion that Mr. Monnier is unable to engage in employment and that
> he is permanently and totally disabled.  He has significant health conditions
> that would absolutely prevent him from employment, specifically with regards
> to his kidney condition with hypertension and his back condition.
>
> * * * *
>
> Regarding the kidney condition, Mr. Monnier has stage III renal failure.  This
> is a serious progressive and irreversible condition.  When chronic kidney
> disease has progressed to Stage IV, it's time to begin preparing for dialysis.
> Chronic renal failure results in large number of complications that Mr.
> Monnier has developed to include abnormalities of hypertension, decreased
> pumping ability of the heart, bradycardia, hyperlipidemia and edema of the
> extremities and elevated blood chemistries to include BUN and creatinine.
>
> The kidney condition has been a significant factor in the development of Stage
> III hypertension that puts Mr. Monnier at great risk for stroke, as Dr.
> Holeyfield noted.  Mr. Monnier's recent hospitalization in January of 2008
> notes blood pressures of 220/124 and 196/121 and was diagnosed with
> hypertensive emergency.   He underwent occipital nerve blocks for the
> headaches without much relief.  He was discharged in a guarded condition.  He
> was re-admitted in April of 2008 with sudden confusion and possible transient
> ischemic attacks.

-12-

In addition, Mr. Monnier has significant degenerative cervical, thoracic and lumbar disease that has been permanently aggravated with his more recent motor vehicle accident in August of 2007.

Along with the more significant disabling conditions Mr. Monnier's general health is poor. He underwent surgery for prostate cancer, has right foot drop (from a severed peroneal nerve), excruciating headaches, morbid obesity, reflux, urinary incontinence, bradycardia, loss of use of two fingers on the left hand.

In conclusion, it is my opinion that Mr. Monnier is not capable of gainful employment and has not been so since 1999. Since 1999 his condition has deteriorated tremendously and will continue to do so as he is not responsive to treatments established, specifically with regard to his kidney failure and hypertension and significant limitation in spinal range of motion.

Filing 24 at pp. 22-23/112, M00352-M00353. Plaintiff provided Dr. Gammel's report and supplemental medical records to Hartford. Filing 24 at pp. 11-12/112, M00341-M00342.

30. In August 2008, Hartford procured a medical opinion (Filing 23 at pp. 76-81/112, M00287-M00292) from Dr. Jacqueline Hess. Dr. Hess did not examine the plaintiff. Her opinions were based on medical records selected and provided by Hartford, including documents vaguely described as "various medical forms" from Holmes Regional Medical Center, Midlands Hospital, the Nebraska Medical Center, and the University of Nebraska Medical Center. Her report indicates that she had a 10-minute telephone conversation with Dr. Holeyfield on August 21, 2008, and notes that Dr. Holeyfield thought the plaintiff was unable to work in any capacity primarily due to musculoskeletal pain. Notwithstanding Dr. Holeyfield's opinion to the contrary, Dr. Hess opined that the plaintiff appeared to be capable

of full-time sedentary work, with the ability to change position every one to two hours as needed for comfort.  Her opinion was based on the following rationale:

> The patient is a 48 year old male with multiple medical and surgical issues, who has not worked since 03/1999.  The patient's hypertension remains difficult to control, and requires close monitoring and frequent medication adjustments.  Renal disease, prostate disease, and cardiac disease all appear stable and medically controlled.  The patient has been evaluated for mental status changes without diagnostic findings.  The patient has documentation of a borderline mental capacity, however he has been successfully employed previously and there is no evidence of recent change in his status.
>
> Orthopedically, there is a long-standing history of peroneal nerve injury and left hand injury, neither of which previously prevented employment.  The patient returned to work following placement of Harrington rods and reduction of kyphosis, but complained of increased musculoskeletal pain following MVAs in 1997 and 2007.  Evaluation has not substantiated any neurological loss, and there is no recommendation for further surgery at this time.  The patient has not received pain medication other than Tylenol.  Other than reported pain, there is no objective documentation of functional loss which would prevent him from working in a sedentary capacity job with the ability to change positions every one to two hours as needed for comfort.

Filing 23 at p. 80/112; M00291.

31.   On January 11, 2008, Hartford referred plaintiff's claim file to Marvin Bryant, MS, CRC, for an "Employability Analysis."  Filing 27 at pp. 8 & 67, M00674 & M00733. Mr. Bryant's January 24, 2008 report (Filing 27 at pp. 7-66/85, M00673-M00732) indicates that he conducted a "job-person match" using the Occupational Access System ("OASYS"), which he described as "a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles."  Mr. Bryant's computer searches

assumed that the plaintiff was physically capable of performing full-time sedentary work.

Bryant concluded and reported that the plaintiff was capable of performing the following

jobs, and that the jobs existed in the "Nebraska Metro Economic Region":

1.  017.261-030: Drafter, Detail, Sedentary, Skilled, Local OES $16.78
2.  221.367-022: Industrial-Order Clerk, Sedentary, Semi-Skilled, Local OES $12.91
3.  379.367-010: Surveillance System Monitor, Sedentary, Unskilled, Local OES $11.46
4.  205.367-014: Charge Account Charge, Sedentary, Unskilled, Local OES $10.96
5.  712.687-034: Suture Winder, Hand, Sedentary, Unskilled, Local OES $10.66
6.  249.587-014: Cutter and Paster, Press Clippings, Sedentary, Unskilled, Local OES $11.36

Filing 27 at p. 8/85, M00674.

32.   On or about September 11, 2008, Hartford denied plaintiff's appeal, based in

large part on the opinions of Jacqueline Hess, MD.  *See* Filing 23 at pp. 65-296, M00293-

M00296.

## IV.  CONCLUSIONS OF LAW

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring

a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights

under the terms of the plan, or to clarify his rights to future benefits under the terms of the

plan...." 29 U.S.C. § 1132(a)(1)(B). "ERISA provides a plan beneficiary with the right to

judicial review of a benefits determination." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th

Cir. 1998). The plaintiff bears the ultimate burden of establishing his right to receive

benefits under ERISA.  *Wilson v. Life Ins. Co. of N. Am.*, 424 F. Supp. 2d 1146, 1156 (D. Neb. 2006).

Hartford concedes that its decision to terminate plaintiff's disability benefits is reviewable *de novo* in this case.  "A *de novo* review is to be done 'without giving any deference to the administrator's decision.'"  *Sloan v. Hartford Life & Acc. Ins. Co.*, 433 F. Supp. 2d 1037 (D.N.D. 2006), *aff'd*, 475 F.3d 999 (8th Cir. 2007) (quoting *Davidson v. Prudential Ins. Co.*, 953 F.2d 1093, 1095 (8th Cir. 1992)).  Issues of plan interpretation, as well as fact-based determinations made by the plan administrator, are subject to *de novo* review. *Id.*  (citing *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001)).  This court's finding as to whether the plaintiff qualifies for long-term disability benefits is a finding of fact subject to a "clearly erroneous" standard of review by the Court of Appeals. *Sloan v. Hartford Life & Acc. Ins. Co.*, 475 F.3d 999, 1005 (8th Cir. 2007) (citing *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993)).

Relying in large part on the result achieved by the insurer in *DuMond v. Centex Corp.*, 172 F.3d 618 (1999), in which the court held that the plaintiff's medical records did not establish disability due to chronic fatigue syndrome, Hartford has taken the position that, even under a *de novo* standard of review, "the medical evidence is clear that Mr. Monnier is capable of sedentary work and is no longer disabled under the Plan's definition of any occupation disability."  Filing 40 at p. 10/18.  The court finds to the contrary.

-16-

The administrative record maintained by Hartford shows that the insurer undertook a lengthy and comprehensive review before deciding to awarding plaintiff long-term disability benefits in 1999. As explained in the insurer's December 2, 1999 letter (Filing 30 at pp. 44-45/85, M00965-M00966), benefits under the policy were payable for 24 months if the plaintiff remained totally disabled from his own occupation as a drafter. After the 24-month period expired, the plaintiff remained eligible for benefits only if he remained totally disabled from any occupation for which he was or became qualified by education, training or experience. To maintain his qualification for benefits, the policy required the plaintiff to be under the regular care of a licensed physician and provide proof of his continuing disability. The court finds that plaintiff has complied with all of these requirements.

"In determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 590 (8th Cir. 2002) (citing *Walke v. Group Long Term Disability Ins.,* 256 F.3d 835, 840-41 (8th Cir. 2001)); *accord Pearson v. Group Long Term Disability Plan for Employees of Tyco Intern. (US), Inc.*, 538 F. Supp. 2d 1073, 1083 (E.D. Ark. 2008). "The past payment of benefits does not create a presumptive burden for the administrator to overcome; however, it is a factor to consider when the information available to the administrator between the granting and terminating of benefits has not changed."

*Rosby v. Unum Life Ins. Co. of Am.*, — F. Supp. 2d —, 2009 WL 3245925 (E.D. Ark., Oct. 7, 2009).

In 1999, the insurance company made a fully-deliberated decision to pay benefits. It appears that plaintiff's disability benefits were paid without significant incident until Hartford assumed the administration of the Policy around 2005. After the very thorough investigation it conducted in 2005 (including six days of surveillance by a private investigator), Hartford's own investigator—who had interviewed the plaintiff for almost four hours at the plaintiff's residence—concluded that the plaintiff was, in fact, totally disabled. Hartford determined that the plaintiff remained eligible to receive full time disability benefits under the Policy.

Focusing on the most relevant time period, i.e., between October 2005 and the September 11, 2008 final decision to terminate benefits, the court finds that plaintiff's medical condition has not improved; in fact, it appears to have gotten worse. The main condition that has changed is that Hartford was able to obtain a favorable expert opinion from a consulting physician who has never seen, much less examined, the plaintiff.

Notwithstanding the conclusion reached by its own investigator in 2005, Hartford aggressively pursued a course of continuous investigation of the plaintiff's claim, including the form letters it transmitted to plaintiff's treating physicians in 2007. The two form letters sent to plaintiff's doctors pose technical hypothetical questions, similar to those routinely presented to the vocational experts who testify in Social Security proceedings. The two letters do not contain the same hypothetical information, and the form letter sent to plaintiff's

-18-

nephrologist, Dr. Groggel, contains very little information at all.  Based on the select information presented by Hartford in its form letter to Dr. Groggel, it is not surprising that Dr. Groggel returned a response indicating that he did agree with one of the proposed restrictions.

Turning to the form letter Hartford sent to "Dr. Holeyfield Jr.," the court credits Dr. Holeyfield's explanation that he did not understand the October 17, 2007 form letter to refer to an 8-hour workday.  Dr. Holeyfield is the plaintiff's primary care physician, has known and treated the plaintiff on a regular basis for several years, and is qualified to issue an opinion as to the plaintiff's actual state of disability.  Dr. Holeyfield's March 10, 2008 Disability Letter, which was timely presented to Hartford, clarified that he did not believe the plaintiff was able to work more than a total of 1-2 hours a day, due to his chronic pains.  This conclusion is amply demonstrated by the medical records presented to Hartford.

The opinion issued by Dr. Hess that the plaintiff is physically capable of performing full-time sedentary work is based largely on her observations that he was able to work until March 1999 and "[e]valuation has not substantiated any neurological loss, and there is no recommendation for further surgery at this time."  She discounted plaintiff's complaints of pain, in part, because he had received no pain medication "other than Tylenol,"[6] glossing over the fact that the plaintiff cannot not take other pain medications and is not a good candidate for surgery because of his failing kidney.

---

[6]The plaintiff was taking prescription Tylenol with codeine, not over-the-counter Tylenol.

Dr. Gammel, the expert retained by the plaintiff, itemized the medical records he reviewed and personally examined the plaintiff. His conclusions that the plaintiff is unable to engage in employment and is permanently and totally disabled are amply supported by the medical records presented to this court.

Based on my *de novo* review of Hartford's administrative record, I find and conclude that the plaintiff is not capable of gainful employment and has not been so since 1999. As of July 2008, plaintiff had stage III renal failure. Plaintiff's kidney condition significantly contributed to the development of Stage III hypertension, and plaintiff is at great risk for stroke. Plaintiff was significantly limited in his spinal range of motion, his hypertension was not responsive to treatment, and he suffered from excruciating headaches. The record strongly supports Dr. Gammel's conclusion that, since 1999, plaintiff's condition has deteriorated tremendously and will continue to deteriorate.

Upon *de novo* review, the court finds that the plaintiff has established his right to receive disability benefits as claimed.

## V.  ORDER

**IT IS ORDERED:**

1.  Plaintiff's Motion for Summary Judgment (Filing 38) is granted in all respects.

2.  Defendants' Motion for Summary Judgment (Filing 39) is denied.

3.  Pursuant to 29 U.S.C. § 1132(g), plaintiff may file a Motion for Attorney Fees. Said motion shall be filed no later than **March 15, 2010** and shall comply with the

requirements of NECivR 54.1, 54.3 and 54.4.  The defendants shall respond within the time allowed by NECivR 7.0.1(b)(1)(B).

    4.   A separate judgment will be entered after the matter of attorney's fees is decided.

**DATED February 11, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**